**In re William D. PUGH and Elizabeth Pugh, Debtor.**

**V. John BROOK, Jr., Trustee, Plaintiff,**

**v.**

**William D. PUGH and Elizabeth Pugh, Defendants.**

Bankruptcy No. 91–12432–8P7.
Adversary No. 95–505.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

March 6, 1996.

Allan C. Watkins, Tampa, Florida, for Plaintiff.

Buddy D. Ford, Tampa, Florida, for Defendant.

Sara Kistler, Tampa, Florida, Assistant United States Trustee.

## FINDINGS OF FACTS, CONCLUSIONS OF LAW, AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a Chapter 7 case and the matters under consideration are three claims set forth in a Complaint filed by V. John Brook, Jr. (Trustee) against William D. Pugh and Elizabeth Pugh (Debtors). In Count I the Trustee seeks an accounting; in Count II a turnover of funds; and in Count III the imposition of an equitable lien. The Complaint was filed on July 21, 1995, and answered in due course. After conclusion of discovery, the matter was set for trial during which the following facts were established:

At all relevant times, the Debtors owned and operated a small chicken farm in Plant City, Florida. Some time prior to seeking bankruptcy protection, Mr. Pugh was involved in an automobile accident and sustained significant injuries, for which he asserted a claim and sought to recover damages. The attorney retained by him was able to negotiate a settlement of his claim without the necessity of filing a law suit. The total amount of the settlement was $100,000.00 and after payment of fees and costs, Mr. Pugh netted $75,000.00 shortly before filing for bankruptcy. At roughly that same time, due to the Debtors' inability to service the mortgage encumbering the ranch, the lender, Sun Bank of Pasco County (Sun Bank), foreclosed and on September 17, 1991, the Circuit court entered Summary Final Judgment in favor of Sun Bank in the amount of $715,-902.12. The Judgment was recorded in the Public Records of Polk County on September 19, 1991. On September 13, 1991, or 4 days prior to the entry of the Judgment, Mr. Pugh applied for two Single Premium Immediate Term Certain Annuity" contracts with face amounts of $37,500 each through Jackson National Life Insurance Company (Jackson National). The annuities were paid for with the proceeds from the personal injury settlement.

On September 27, 1991, the Debtors filed their voluntary Petition for Relief under Chapter 11 in order to prevent an impending foreclosure sale of the ranch. The Jackson Life annuities were scheduled by the Debtors and claimed as exempt with a value of $501.00. On November 4, 1991, Sun Bank sought relief from the automatic stay in order to complete its foreclosure. Not long thereafter as a result of intense negotiations, Sun Bank agreed to settle its foreclosure activities for $50,000.00 to be paid in 30 days from the date of the entry of the Order denying Sun Bank's Motion for Relief From Stay. Without this Court's authorization which is required by § 364, the Debtors borrowed $50,000.00 from the Jackson National annuities, paid Sun Bank and obtained a satisfaction of the foreclosure judgment.

On February 5, 1992, the Debtors filed a Notice of Voluntary Conversion of their case to a Chapter 7 case and on February 12, 1992, this Court entered an Order of Conversion and scheduled the 341 meeting for March 19, 1992. In due course, V. John Brook, Jr. was appointed as interim Trustee and later succeeded himself as permanent Trustee. The meeting of creditors was ultimately concluded on April 16, 1992.

The record reveals that shortly before that time on April 12, 1992, the Debtors amended their Schedules to reflect for the first time an asset described as an unliquidated breach of contract claim against Zephyr Egg Co. (Zephyr Egg). The asset was valued at zero and claimed as exempt. The trustee learned of the claim at the § 341 meeting, but no objection was filed to this newly-claimed exemption for more than two years, during which time the Debtors received their discharge.

At trial it was established that during the pendency of the Chapter 7 case the Trustee negotiated a settlement of the Trustee's interest in the Zephyr Egg lawsuit with the Debtors' attorney and the state court attorney. Regrettably, the Trustee never filed an Application to employ that attorney as special counsel for the estate, not sought leave to compromise the Zephyr Egg claim.

Specifically, the record reveals that the Trustee, by letter dated April 20, 1992, asked

state court counsel what action he proposed to take with regard to the claim against Zephyr Egg. The Debtor's attorney replied that the Debtors were willing to split the pending settlement proceeds on a 70%–30% basis, with the estate to receive 70% of the recovery. The Debtors' attorney also made the following request to the Trustee: "please advise if we need to execute any sort of fee agreement on behalf of the Bankruptcy estate."

On May 25, 1992, the Trustee wrote to Debtors' attorney and confirmed the arrangement outlined above and requested Debtors' counsel to "[p]lease confirm that this is the Debtors' understanding so I can do the appropriate paperwork." In furtherance of this casual arrangement, on September 9, 1992, the trustee filed a "Report And Notice of Intention to Sell Property of the Estate." The Notice listed the sales price as "70/30 split on future settlement" of the Zephyr Egg claim. On March 19, 1993, the Trustee filed a Motion to Approve Assignment of Claims or in the Alternative to Approve Settlement of Claims designed to obtain this Court's approval of the settlement of the Zephyr Egg claim under the terms outlined above. On May 17, 1993, this Court denied the motion for improper service.

In the interim, State Court counsel for the Debtor settled the suit with Zephyr Egg and after deducting $25,000.00 as his fee plus $2,029.25 for costs, he disbursed the balance of approximately $75,000.00 to the Debtors. The Debtors used those proceeds to repay the $50,000 loan from the Jackson National annuities, to pay an accountant the sum of $2,300.00, and to pay approximately $5,359.95 to certain creditors in full satisfaction of their claims which totalled approximately $12,-000.00. The Debtors also tendered to the Trustee the sum of $13,400 in the form of two checks: the first, in the amount of $3400 and the second, in the amount of $10,000 under the mistaken belief that these funds would have been sufficient to pay in full the claim of creditors who had allowed claims which had not been settled earlier by the Debtors. The Trustee did not negotiate the second check which bore the notation "in full payment" on its face.

On July 16, 1993, the Trustee filed a Motion for Order to Show Cause why the Debtors should not be held in contempt for failing to turn over the seventy percent as promised. That motion was denied for improper service, but on July 23, 1993, the Trustee filed his Amended Motion For Order to Show Cause. The Motion was granted on August 4, 1993 and a final evidentiary hearing was scheduled. In the meantime, the Trustee filed a Notice of Surplus Funds indicating that there were sufficient funds to pay all priority claims and all timely-filed and allowed claims.

On March 24, 1994, this Court entered its Order (Contempt Order) on the contempt proceeding instituted by the Amended Order to Show Cause and made the following findings and ruling. First, the Court held that the Trustee's request to find the Debtors in contempt had no evidentiary support because there was never an Order entered by this Court which required the Debtors to turn over any part of the proceeds of the Zephyr Egg settlement. Second, even though the particular matter before the Court was simply the Trustee's request to hold the Debtors in contempt, in order to avoid further litigation, the Court considered the Trustee's entitlement to any part of the settlement proceeds and in light of *Taylor v. Freeland & Kronz*, 503 U.S. 638, 112 S.Ct. 1644, 118 L.Ed.2d 280 (1992), concluded that the Debtor's right to the settlement proceeds were conclusively determined because no objection was interposed within 30 days from the date of the Amendment of Schedule C in which the Debtors claimed the settlement proceeds exempt. It now must be pointed out that at the time that conclusion was reached, this Court was not aware that the Amended Schedule C filed on April 12, 1992, was not served on any parties of interest.

Based on *Taylor, supra,* the Court concluded that the Trustee was not entitled to any part of the settlement proceeds unless the alleged agreement between the Debtors could be found binding even though the same was never submitted for the Court's consideration and was never approved. The Court answered this question in the negative and held first that based on the documents submitted in evidence, i.e., the correspondence

between the Trustee and the attorney who represented the Debtor lacked sufficient legal force to operate as a binding and an enforceable contract. Second, even assuming the agreement did have the force of a valid contract, the Trustee never complied with F.R.B.P. 9019(a) which requires court approval of any compromise a claim which is property of the estate. Based on the foregoing, this Court held that any future request by the Trustee to retain any part of the proceeds of the settlement would be considered without merit and denied.

The next chapter in this convoluted saga began on June 15, 1994, when the Trustee moved to strike the Debtors' Amended Schedule C filed some two years earlier, for improper service. This Court granted the Motion to Strike and on August 30, 1994, the Debtors filed their Second Amended Schedule C which was properly served on the parties of interest. Although the Trustee did not object to the Second Amended Schedule C, several creditors (who as a result of the Notice of Surplus Funds had filed claims after the bar date) filed objections to the claim of exemption of the Zephyr Egg action set forth in the Second Amended Schedule C. One Objection to the Claim of Exemption was filed by the United States of America (Government) on behalf of the Farmers Home Administration. To continue true to the pattern developed in this case, this Court overruled the objection of the Government without prejudice because the same was not served on the Debtors.

On October 21, 1994, the Government timely filed its Amended Objection to the claim of exemption relating to the settlement proceeds of the Zephyr Egg litigation. On November 29, 1994, the Debtors filed a response to the Government's objection. At the rescheduled hearing on the amended objection of the Government, this Court sustained the Objection and on June 19, 1995, entered an Order determining that the Debtors' claim against Zephyr Egg was property of the estate. That Order understandably inspired the Trustee's Complaint seeking an accounting of the proceeds of the settlement (Count I); turnover of those proceeds (Count II); and imposition of an equitable lien on the Jackson National annuities (Count III).

■ The Debtors contend that this Court previously considered the exemption issue during the course of the show cause proceedings and that the Order entered on the contempt proceeding on March 24, 18894, and was a binding final determination of the exemption status of the settlement proceeds obtained from the Zephyr Egg litigation upon these proceedings. The record is devoid of any indication that this Order was ever appealed despite the fact that it resolved with finality the issue of whether the Debtors' failure to turn over proceeds of the Zephyr Egg settlement was contemptuous. Thus, it became the established law of this case. *See, e.g., Unioil, Inc. v. H.E. Elledge, 270 Corp.,* 962 F.2d 988 (10th Cir.1992). However, the Debtors' argument that the Contempt Order is binding on this adversary action is flawed for several reasons. First, the status of the claimed exemption was not before the Court at all at that time, and any comments made by this Court were not relevant and necessary to resolve the only issue which was before this Court, i.e., whether the Debtors were guilty of civil contempt. To the extent that the Order commented on the status of a particular claim of exemption, such views are simply dicta, of which it has been said that:

> For good or for bad, opinion-writing judges—unlike legislators—can make cases decide no more than the cases present. For example, no matter how often or how plainly a judicial panel may put in its opinion that "we hold X," "X" is not law and is not binding on later panels unless "X" was squarely presented by the facts of the case and was a proposition that absolutely must have been decided to decide the concrete case then before the court. All readers of judicial opinions, but especially members of later judicial panels, have the right (for judges, the duty) to look beyond the words of an opinion in which a panel attempts to explain the reasons for its decision and to determine what was decided in reality.

*New Port Largo, Inc. v. Monroe County,* 985 F.2d 1488, 1500 n. 7 (11th Cir.) (Edmondson,

J., concurring), *cert. denied,* —— U.S. ——, 114 S.Ct. 439, 126 L.Ed.2d 373 (1993); *see also City Bank & Trust Co. v. Vann,* 67 F.3d 277 (11th Cir.1995).

Second, the Government was not a party to the show cause proceedings. It is fundamental that due process would require a creditor, whose valuable right to object to a claim of exemption was at issue, be given notice and an opportunity to be heard on the matter before a ruling was made. Such due process was afforded the Government for the first time in late 1995 and resulted in an Order Sustaining the Objection to Debtors' Claim of Exemption.

Based on the foregoing, it is evident and this Court is satisfied that under the standard definition of property of the estate as set forth in § 541(a), the Debtors' claim against Zephyr Egg was property of the estate and clearly subject to administration by the Trustee. Theoretically, that would compel the conclusion that all parties who have received payment, including creditors who received some payments in settlement of their claims, and of course, counsel for the Debtor who was in charge of the State Court litigation, should be required to turn over what they received to the Trustee.

It now appears that the Trustee only seeks to recover the net proceeds received from the settlement, that is the sum of $44,-317.56. Although there is no direct evidence on the point, this Court is satisfied that the Debtors are not in a position to refund this amount to the estate and ordinarily it would be a phyrric victory to obtain a money judgment against the Debtors. However, in this particular instance it is without dispute that the Debtors utilized the funds they received from the settlement to repay the loan from the Jackson National annuities which served to reinstate their equity; thus, it is appropriate to fashion a remedy which grants a constructive trust on the Debtors' interest in the annuities to the extent of $44,317.56. The constructive trust is an equity device to correct a wrong and under these circumstances, while the imposition of an equitable lien is not warranted, it is clearly appropriate to use this remedy to make the estate whole. The Trustee also seeks the imposition of an equi-

table lien on the Debtors' residence. There are no facts in this record which would warrant this relief under the generally-recognized principles governing equitable liens.

Based on the foregoing it is appropriate to enter a separate final judgment in favor of the Trustee on Count II, determining that the settlement proceeds are property of the estate. The Debtors shall turn over the sum of $44,317.56 to the Trustee or, in the alternative if they fail to do so, the Trustee shall be entitled to the imposition of a constructive trust in the Debtors' interest in the annuity contracts currently maintained by Jackson National.

Final Judgment shall be, however, entered in favor of the Debtors against the Trustee on Count I because an accounting is unnecessary given the resolution of Count II. Additionally, the Judgment shall be in the Debtors' favor in Count III in which the Trustee sought the imposition of equitable lien.

A separate Final Judgment shall be entered in accordance with the foregoing.

DONE AND ORDERED.